Good afternoon, ladies and gentlemen. We have five cases on the calendar this afternoon. Three patent cases, a veterans case, a government employee case, and the latter two will be submitted on the briefs and therefore will not be argued. The third case will be argued in camera and so when we get to that case we will ask anyone who is not connected to one of the parties or to the court to please excuse yourself. In the meantime, we will begin with Tokyo Keiso Company v. SMC and Chronotech, 2008-1045, Mr. Sackstetter. Sackstetter, thank you, Your Honor. Michael Sackstetter on behalf of Tokyo Keiso and Crona Messtechnik. This is actually two appeals in the same case from two different courts. The California court should be reversed because it incorrectly granted summary judgment of obviousness after making numerous factual determinations concerning the Graham v. John Deere factors including those relating to the content of the prior art, the differences between the prior art and the claimed invention, and also secondary considerations. Those decisions should have been made by the jury and should have been left to the jury and when correctly decided they lead to non-obviousness, not obviousness. These references look pretty close to me, the claimed invention. Well, perhaps I should just jump to the obviousness issue and discuss those. There are actually four what I call fallacies in the arguments that SMC advanced in the district court and which unfortunately the district court accepted. The first of those is, it's all through the red brief, it's the words Linworth, the 1986 Linworth article and it discloses delaying the interfering signal so that it will arrive too late to interfere. The problem is that's not what the Linworth reference says and in order to show that we have to parse the language that's relevant here. That language which is at A01595 in the appendix is, flow in plastic pipes including glass fiber reinforced plastic pipes and Teflon hose is often easier to measure than in metal pipes of the same dimensions because of the relative absence of acoustic short circuit, comma, and relatively low sound speed in the plastic pipe. Comma and, very important, those are two different concepts and the latter is not the solution to the former. But look, doesn't the invention claim and don't the references describe means for measuring fluid flow using plastic materials to avoid this short circuiting? That depends on what you mean by short circuit. The acoustic short circuit term actually appears one time in all of these references that we've been talking about in that one sentence that I just read to you. The reference to acoustic short circuit occurs before the comma and, after the comma and is the talk about the slower sound speed and that's actually referring back to something that was known many years before. In fact, it's in Mr. Linworth's 1967 article. There's a good illustration from that on page 37 of the blue brief and that shows a flow meter that uses transverse mounted transducers rather than the axial mounted transducers of the patented invention which are on the ends of the tube. These are on the sides of the tube and the benefit of having the slow sound speed which is described both in this 1967 article and is referred to in the 1986 article is that the whole point, it goes back to Snell's Law, which says that the ratio of the angle of incidence, the sound coming into the pipe from the side, relates to the, this is a little hard to explain, the angle of refraction, how far it goes down the tube. The difference in speed between the pipe and the fluid is what affects that. In the 1967 article, Mr. Linworth said, at larger refracted angles, the refracted ray in water propagates with a greater component of its velocity vector parallel to the tube axis. It goes farther down the tube. This in turn can lead to simpler and more accurate ultrasonic flow determinations based on upstream and downstream measurements. Plastic tubing is particularly amenable to this application because of its low sound speed. That's exactly the same thing that Mr. Linworth was saying in his 1986 article except he said it in one clause because he had already said it in longer form in this 1967 article. He's not talking about slowing down any interfering signal. This is a situation where you want the signal to go through the pipe. Okay, so let's talk about acoustic short circuit. What is happening with that one reference that Mr. Linworth makes to that? Well... What is an acoustic short circuit? That's a little hard to tell. I looked at Mr. Linworth's declaration and he doesn't really define it. But as near as I can tell, and if you look at Dr. Anderson's declaration that we submitted, he interprets what Mr. Linworth said in his article as referring to the sound going around the edges of the tube, rather than through the fluid, going around the edges of the tube and getting to the transducer on the other side, which sounds similar to what we're talking about with this patent. However, the solution there that's disclosed in the 1986 Linworth article is the relative absence of acoustic short circuit. And what he's talking about there is attenuation... You're giving an awfully long-winded answer to what I would have thought was a simple question, which is what this invention is all about, which is to avoid complicating the measurement of the sound by having the competing sound get there first. That's correct. It's to avoid having an interfering signal. And this may have something to do with an interfering signal, but the way that the Linworth article suggests to solve that problem is by attenuating the interfering signal to the extent there is one, the relative absence of acoustic short circuit, and then it has the comma and then the and. And you do it with plastic, right? That's correct. And that's in the prior art. It is. It's in the Baumol patent that was considered during the prosecution. It's disclosed in the 1967 article. But the use that the plastic is put to is different in the patented invention. In the patented invention, it is to slow down the sound. But this isn't a use claim. This is an apparatus claim. So whatever the use is, if you have roughly the same apparatus in the prior art, it's obvious, isn't it? But the way the tube is used, well, let's talk about what the tube is first of all. And this is another problem that arose in the district court's opinion. The tube is not just a plastic tube. It's not a polymer tube. It's not a fluorocarbon tube. All these things are disclosed in the prior art. It is, in Claim 1, it is a measuring line that transmits sound slower than the fluid does. And then Claim 2 narrows that so that it is plastic that transmits sound slower than the fluid does. Now in Mr.— Wait, so how is 1 broader than 2? So you're saying 1 does not include plastic or includes plastic, but everything else in the universe? One could include wood. One could include concrete. It doesn't limit it to plastic. 2 has to transmit sound slower than the sound of the fluid, but it has to be plastic as well. But not every plastic satisfies that requirement. And then Claim 5 is a particular type of plastic that transmits sound slower than— But you say not every plastic satisfies it, but isn't that what the specification tells us? I mean, you say broadly plastic is preferably used as the material from the measuring line. It does refer— Is there anything in the specification that differentiates different kinds of plastic? There's reference to PFA plastic. There's reference to PFTE plastic. It does contain that language. Excuse me. I know where the PFA is, but that sentence I was reading ends, especially PFA. But that just says especially PFA, but it doesn't seem to exclude anything other than plastic in general. So where in the specification can you show me there's an exclusion or a differentiation between types of plastic? It is in the claim portion of the specification. The claim's actually limited to either, in Claim 2, plastic that transmits sound slower than the fluid does, or in Claim 5, it limits it explicitly to PFA, which also transmits sound slower than the fluid does. And this analysis never really happened in the district court's opinion because the district court simply smashed all the claims together, said plastic is plastic, which we have submitted evidence that it simply isn't the case, and then determined that all the claims were invalid. Can I just, maybe I'm just unnecessarily confused by this, but your contention is that the claim covers more than just plastic, more than any kind of plastic, that Claim 1 is broader than that. Claim 1, by its terms, covers potentially, it may or may not, it hasn't been construed in that way. But what it says is that the measuring line is made of material that transmits sound slower than the fluid does. And is there anything in the spec you can point me to that suggests that something would be anything other than plastic? No. No, there isn't. So perhaps they are of roughly equal breadth. But Claim 2 then says it has to be plastic. That thing that transmits sound slower has to be plastic. And then Claim 5 says that it has to be PFA. So once the, if you accept the proposition that the Linworth article does not disclose slowing down the sound to address this acoustic short circuit problem, and that's what we submit, then their next argument is that attenuation and slowing down the sound are the same thing. The trouble is that attenuation and using a threshold voltage are disclaimed in the specification. They are actually disclosed, or something similar to that is disclosed in the Baumol reference that was in the prosecution. Finally, there is the issue of secondary considerations, and specifically long felt need. If you look at the references in Mr. Linworth's 1986 article, he's written a whole lot. There's one half of one sentence that supposedly relates to this issue in all of that. There is evidence from Mr. Hashimoto concerning long felt need. There's evidence from Dr. Anderson concerning long felt need. And the only things that the district court did to address that were, one, to say, well, this is a niche market. And so that can't, you know, it isn't surprising that it took a long time to come up with this. That argument is not even made in the red brief. The SMC is not advancing that argument in this court. So the only other argument on that was that there can't be any long felt need because this invention was disclosed in the prior art. The trouble with that is that it assumes obviousness. It uses an assumption of obviousness to say that this factor, this objective indicia of non-obviousness is not present. But that's what they have to prove. They have to prove that the invention is obvious, not bootstrap it and be able to use that to argue obviousness. You're into your rebuttal. Would you like to save it? Thank you very much. I'll save it for you. Mr. Neustadt. Thank you, Your Honor. Lindbergh does absolutely disclose slowing down the signal. Here, this was page five of our brief. And this just showed what we had here. This was figure one of the patent. Figure one was an illustration of both the prior art and the invention. The patent was very specific that this was prior art as long as you used a metal tube. And it was the invention as long as you used plastic. You had a supply line. The whole purpose here is you want to measure the speed of the fluid that's going through this line. So you've got fluid coming in through the supply line. It goes through the line, comes out the other end. You've got a transmitter here, a transmitter here. This transmitter is sending signals into the fluid. The fluid then goes down here. And then you detect that signal here. So that tells you this time distance. They do it in the other direction, too. Here you've got a signal that's being generated. It goes down here. And that's then detected here. And you've got the fluid going in a certain direction. So obviously when you're going with the fluid, it's going to go faster. When you're going against the fluid, it's going to go slower. And this is all prior art. We put all this information in. How does Urmson fit into your obviousness analysis? Urmson shows that you should use a plastic tube in order to attenuate the signal so you don't have an interfering signal in the tube. So that's how Urmson fits in. Linworth is a more direct disclosure. Linworth says delay the signal so it arrives too late so it will not interfere. Urmson says why don't you just attenuate the entire signal so you don't even have to worry when it arrives. So they both accomplish the same function. And contrary to what counsel said, Urmson specifically says I'm using plastic so it's not a good acoustic conductor. Are they 102 references? No. We did not use 102 because we had this disclosure of the prior art in the patent which Judge Wright relied upon as an admission. And then we combined that with Linworth who said use Teflon because Teflon will avoid the acoustic short circuit. And let me get to your question. What is an acoustic short circuit? I told you that you've got signals going this way, signals going this way. They're in the fluid. You're detecting them. They go into a computer or whatever, all prior art. The patent has nothing to do with this. From that they get the speed of the fluid. Now what you don't want is you don't want signals in the tube because you're detecting signals in the fluid. How do signals get into the tube, into part two? How do signals get into what's labeled tube so as they interfere? Well, in this case, the transmitter, the transducer, actually generates the signal which goes into the wall of the tube. And then it goes through the wall and then gets into the fluid. Sometimes you use what's called wetted transducers where you put the signal in directly. But even when you put the signal in directly, perhaps it can migrate up to the tube. So you don't want these extraneous signals in here. Prior art uses metal. Linworth comes out in 87 and he specifically says use Teflon because you want to slow down the signal. There is a very pertinent disclosure in the 004 patent where you reduce this to numbers. And this very pertinent disclosure was in column 2 in column 3. And he says the signal in the fluid... Let me give you the line reference for that. That would be in line 18. Column 2, line 18? Column 3, line 18. And I guess you go down to line 19. He says the sound velocity in plastic is in the range of 1,000 meters per second. So we're talking about the sound propagating in plastic at 1,000 meters a second. And then he says, hence clearly less than the sound velocity of roughly 1,500 meters per second for fluids already mentioned above. So if you've got your speed of 1,000 meters per second and 1,500 meters per second, the 1,500 meters per second will arrive much quicker. You detect that signal and you say, OK, I've detected the signal. I'm not going to detect anything else. So the 1,000 meters per second arrives too late. Did I understand you to say that Linworth adds the plastic to Urmson? I'm sorry, I didn't understand your question. Adds the plastic to Urmson? Linworth has a plastic and he also has a Teflon plastic. Right. And doesn't Urmson also? Yes. Right. They both have plastic. All right. And how do we know that PFA is in the Teflon family? Yes. How do we know that? I know you agree with that. It was put in in the declaration by Mr. Linworth, who was our expert, and it was not disputed at the summary judgment hearing by Tokyo KSO. And Judge Wright specifically put that in his decision. Was it polyfluoro? I saw it on the slide. Yes. Linworth has a very pertinent paragraph in which he says exactly this. I want to delay the signal. And you recall I gave you the illustration in the past, 1,500 meters per second for the water, 1,000 meters per second for plastic. Linworth has the exact same thing. He says 1,500 meters per second for the water, and then he says the Teflon plastic is 1,350 meters per second, and that will arrive too late. Are you at page 1595 in the appendix? Yes, exactly. And this is in the second sentence of Linworth. He says, according to two, and that's another reference, the longitudinal velocity in Teflon, that's the tube material, for example, is 1,350 meters per second, which is less than the nominal value for water, which is usually your fluid, which is 1,500 meters per second. So he's saying it arrives too late. The reason why they use the term acoustic short circuit is because these are sound signals. That's acoustic. Short circuit just means it gets there too quickly through the metal. It's a short circuit. You get a fast flow there, and when you're looking for a signal to detect as the signal of the fluid how fast it's moving, you don't want to get the signal that went through the metal because that doesn't tell you how fast the signal in the fluid meant. So that's what you have to exclude. And Linworth uses that term, acoustic short circuit, because that is what he wants to prevent. First, in plastic pipes, including glass fiber reinforced plastic pipe and Teflon hose, it's often easier to measure than in metal pipes, metal was the prior art, of the same dimension, because of the relative absence of acoustic short circuit, which means that you don't have a signal going through the tube, which is going to mess up your calculation. And then he says, and relatively low sound speed in the plastic pipe, which just means that the sound is going to travel slower in the plastic pipe and therefore arrive too late to interfere. Mr. Sackstetter, I think there was some discussion, Mr. Sackstetter was discussing the term attenuation, and I think he, correct me if I'm wrong, he was pointing out that, and maybe I misunderstood it, I'm not recalling it correctly, but I thought he said that the Linworth article focuses on attenuation and that the patent does something different. What do you understand by attenuation? I don't think attenuation really comes into this. I think they're trying to get, go to other Linworth articles and read other things into them to try to obfuscate this matter. I don't think it has anything to do with attenuation. But I mean, in other words, but what do you understand the term attenuation in percent? Well, I understand the term, but I don't understand the, I don't think that term has any reference to this, unless you're talking, maybe he's referring to Urmson. When, Urmson, let me take you to. No, but I just want to understand before you give that, the term attenuation, just standing alone, what do you understand it to mean? Whether or not it has purpose here. Oh, okay. Attenuation means that you use plastic. The acoustic signal will not go through the plastic. It'll go through the metal, it won't go through the plastic, the plastic attenuates it. Doesn't it mean weaken? Yes. To weaken in this context. In fact, Urmson specifically says, by the time the signal gets through the plastic, it is so, I don't know if he uses attenuated, but he says its amplitude is so small that we can't detect it. Now, Urmson, and Linworth is the primary reference, but if you go to, and they had a nice disclosure in one of the claims, most of the time you go to the spec, but here in the claims, Urmson, claim 11, column 30. I'm sorry, claim 10, column 30. And it's right at the end. And Urmson, I think, is explaining what you just mentioned, Your Honor. Urmson, in claim 10, at the end, so this would be line 23, talking about using plastic, he says, so that sound energy in the material is strongly attenuated, so that must be what it's, and so that the guide tube itself does not function as an acoustic conductor. So the signal is slowed down. The signal is attenuated. It is slowed down and attenuated. I think it does both. Yeah. But Linworth then speaks of it that way. So that really must be the answer to your question as to attenuation. And acoustic short circuit and acoustic conductor are really two sides, two opposite sides. An acoustic short circuit means the acoustic signal is going to zoom right on through and give you an erroneous reading. And then where Urmson says it's not an acoustic conductor, that means it doesn't go through, so it doesn't give you an erroneous reading. Now, Urmson has another pertinent portion, and this is in Column 9, and this would be Line 58. And there, Urmson's talking about the plastic pipe, and he says, this is so, the end blocks, which we're not concerned with, and the guide tube, which is his tube, do not function as an acoustic conductor. If you have an acoustic conductor, an acoustic short circuit, you're going to have a signal that went through the metal, and what you're trying to measure is the signal going through the fluid, and therefore, you don't want it. Now, let me go to these specific questions that you had mentioned. Urmson does have, prevents an acoustic short circuit. As to the question, what is the invention all about? The invention is all about taking what he says is the prior art and substituting plastic for the metal, because once you substitute plastic for the metal, assuming the plastic has the effective structure, Except your view is that plastic is already in the prior art, right? Oh, because it's in Urmson, and it's also in Linworth, and Linworth's even closer because he talks about Teflon. In Baumol, this is the prosecution history, the examiner read this application the same way we read it,  the examiner saw a reference that said, you can use a tube that has any of these materials, and one of the materials was plastic, and the applicant's attorney in response to that said, aha, he didn't say to use plastic to attenuate the material, he said he didn't use plastic to make sure the signal arrives too late to interfere, and they allowed the patent on that basis. Linworth has exactly the disclosure that would have prevented... That suggests that the invention is limited to a plastic tubing. Certainly, certainly. Linworth has the disclosure which would have prevented the argument that the applicant made to get the case allowed, namely he said Baumol, which was plastic, he said you could use plastic, he said a lot of other things, but he didn't say use plastic because it slows the signal down. And so the applicant's attorney argued, aha, Baumol's no good because it doesn't say it's going to... he's slowing the signal down. And I don't know whether the case should have been allowed or not based upon that argument, but it was. But in any event, Linworth specifically says just that, use Teflon because it will slow the signal down so it will arrive too late so it will not interfere. And he specifically says you will not have the acoustic short circuit, the acoustic short circuit being shorthand for it's going to arrive too early and therefore it will interfere. PFTE, which was mentioned by counsel, is not in any of the claims. They were using that for something in a housing, but it didn't have anything to do with any of the claims. Then he said Linworth does not attenuate. Well, Linworth does not attenuate. Urmson attenuates to destroy the signal so it doesn't interfere. Linworth says I'm going to make sure the signal arrives too late so it doesn't interfere. Speaking of attenuation, Mr. Neustadt, I'm going to have to attenuate your argument. Whatever that means. Mr. Sacksteder, you have a little time left. Thank you, Your Honor. I can't leave the world of attenuation quite yet, however. I would like to put a not equal sign between slowing down and attenuating because they are not the same concept at all. Forms of plastic that attenuate signal, that means lowering its amplitude, not necessarily eliminating it, but decreasing the amplitude, may or may not slow down the signal as well. There are forms of plastic that transmit sound much faster than fluids, much faster than metal. So attenuation as disclosed in Urmson, and that's the only thing that's disclosed in Urmson. There is no slowing down mentioned in Urmson. You didn't hear anything about that at all. So the portion of the Linworth 1986 article, it is our submission, it's the evidence that Dr. Anderson submitted in his declaration, that there are two different concepts. One is the concept of slowing down the signal so that the angle of refraction is such that it gets a better measurement in these side-mounted, these transverse-mounted transducer flow units. Whose law is that? I beg your pardon? Whose law is that? That's Snell's law. Snell's law. Yes, Snell. And actually, well, I don't want to go into it, but supposedly Descartes swiped it. But anyway, under Snell's law, that's what the slowing down relevance is in the Linworth 1986 article. We know that because, A, he says the same thing in his 1967 article in more detail. He's obviously talking about the same thing. There's also a reference. There's an end note to that sentence in the Linworth 1986 article, and it refers back to another article by Dr. Linworth, or Mr. Linworth, rather, and that article, the only reference to the speed in a pipe or in fluid at all, and here the fluid is gas, it talks again about how it is easier to measure the clamp-on, these side-mounted transducers only work, if you have a slow pipe and you have a fast gas. And the reason for that is, again, that you get the good angle of refraction in those particular flow meters. And that's the footnote in the 1986 article that goes back to this earlier publication. And this is all about what the prior art means, what it's talking about. That's at least two Graham factors, and those two factors are subject to factual dispute. The district court simply assumed that what SMC said about them was correct. There is evidence from Dr. Anderson. There's evidence in the reference themselves that shows that that's not what it means, and that someone who is taking one of these axially-mounted flow meters, where you don't care about the angle at all because it's zero, you're actually shooting the signal straight into the pipe, so there is no angle of refraction or angle of incidence that's different from the angle of refraction. So you don't care about that. You're not thinking about the speed of the sound in the pipe, and that's what's inventive about what's in the 004 pad. Thank you, Mr. Sackstetter. We'll see how Snell's law interacts with the law of this court. We'll take the case under advisement.